NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MELISSA S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.C., A.C., J.E., A.E., *Appellees.*

No. 1 CA-JV 20-0009
FILED 8-13-2020

---

Appeal from the Superior Court in Maricopa County
No. JD28668

The Honorable Randall H. Warner, Judge

**AFFIRMED**

---

COUNSEL

John L. Popilek, P.C.
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane Zwillinger
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge David B. Gass and Judge Michael J. Brown joined.

---

**P E R K I N S**, Judge:

¶1 Melissa S. ("Mother") appeals the juvenile court's decision to terminate her parental rights to J.C., A.C., J.E., and A.E. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Mother is the biological parent of J.C. (born 2013), A.C. (born 2015), and J.E. and A.E. (together, the "Twins," both born 2017). Troy C. ("Father Troy") is the father of the two elder children, and Steven E. ("Father Steven") is the father of the Twins. The Fathers are not parties to this appeal.

¶3 This appeal stems from the second dependency action against Mother. This first began in 2014 when DCS removed J.C. from Mother and Father Troy's care and filed a dependency petition alleging neglect due to substance abuse, mental health issues, and domestic violence. Dr. Joseph Bluth conducted a psychological evaluation resulting in his "guarded" prognosis of Mother's parenting abilities. Dr. Bluth noted evidence of Mother's amphetamine abuse and "antisocial personality traits" including impulsivity. After Mother continued to engage in various services DCS offered, DCS returned J.C. to her and moved to dismiss the dependency, which the juvenile court granted.

¶4 But circumstances seemed to worsen in November 2016 as DCS began to receive troubling reports about Mother's relationship with J.C. These reports revealed J.C. had been urinating and defecating on himself at daycare, and even biting other children through the skin. When Mother picked him up, she made statements to J.C. like "[s]ay [g]oodbye to your friends because you won't F— see them again" and "[t]his is your F— fault that this is all happening." She also told J.C. to "[s]hut the F— up." J.C. would use the same language. The source worried Mother would hurt J.C.

¶5 That same month, DCS continued to receive disturbing reports about Mother's living situation (she had reportedly lost her job) and

her relationship with her children, particularly J.C. DCS briefly removed J.C. and A.C. from Mother's care, but returned them to her shortly after with a safety monitor in place. Mother again engaged in numerous services, including counseling and anger management, and was diagnosed with unspecified anxiety and depressive disorder. A nurse practitioner prescribed Mother medication to treat this disorder but she did not take all of them consistently because she was pregnant with the Twins.

¶6            While pregnant, Mother and Father Steven continued to encounter housing issues, despite receiving threemonths of housing subsidies from DCS. DCS also continued to receive reports of Mother's violent outbursts against J.C. and A.C. Father Steven recorded one outburst in which Mother made many profane statements directed at both children. Mother's outbursts caused both children to cry. In late 2017, three-week-old J.E. was admitted to a hospital. Mother and Father Steven engaged in multiple altercations during the hospital stay, and hospital staff expressed concern for their ability to care for the Twins.

¶7            Because of these incidents, DCS removed all four children from Mother's care and filed a second dependency petition alleging neglect due to domestic violence, mental health issues, and potential substance abuse in December 2017. DCS noted that, to reunify with her children, Mother would have to address many issues, including her mental health and inability to maintain stable housing free of domestic violence. DCS provided Mother with substance abuse testing and treatment; psychological and psychiatric evaluations; supervised visits; transportation assistance; a parent aide; therapeutic visitation; housing subsidies; and a family reunification team.

¶8            Dr. James Thal conducted a two-day psychological evaluation of Mother. Dr. Thal stated that Mother's personality test was "highly suggestive of poor impulse control, unbridled anger, and a strong endorsement of the view that aggression is a legitimate means to an end." He also concluded that Mother "likely has an underlying personality disorder with . . . antisocial and borderline traits . . . along with a probable underlying mood disorder as well." His prognosis that Mother would be able to demonstrate minimally adequate parenting in the future was "poor." Dr. Emily Bashah and Dr. John Toma conducted another psychological evaluation and concluded that Mother's "history of emotional disturbances, impulse control problems, poor frustration tolerance and poor self-regulation is a manifestation of mental illness, Bipolar I Disorder." Drs. Bashah and Toma also found that "[w]ith ongoing intensive psychiatric and psychological treatment . . . added with

monitoring for treatment compliance and therapeutic effectiveness, [Mother] is considered to be at low risk to her children." DCS therefore referred Mother for PhD-level counseling with Dr. Kelly Rodriguez.

**¶9**        Mother, J.C., and A.C. also submitted to a bonding and best interest evaluation with Dr. Bluth (who had conducted the psychological evaluation during Mother's first dependency proceeding). Dr. Bluth found that J.C. had an "avoidant attachment" toward Mother and noted his concerns with returning J.C. and A.C. to Mother, including Mother's continued relationship with Father Steven. Dr. Bluth therefore recommended DCS adopt a severance and adoption plan.

**¶10**        Mother struggled with many of her services. She was unsuccessfully closed out of her parent aide service for "poor impulse control, low adaptability, and low flexibility." Mother's therapeutic visits with the children were also unproductive as the elder children—J.C. and A.C.—were not responding well to visits. Mother also reported to Dr. Rodriguez that she had not been consistently taking her medication. Mother and Father Steven also continued to engage in domestic violence, which led to him being arrested and Mother obtaining an Order of Protection against him.

**¶11**        Dr. Rodriguez, who had been engaged in individual counseling with Mother from about February to November 2018, continued to express concerns with Mother's progress. As a result, Dr. Ellen Diana, whom DCS had consulted with on Mother's dependency action, declined to extend Mother a third counseling referral with Dr. Rodriguez. Mother did not attend the next two counseling sessions with Dr. Rodriguez or her termination session in January 2019. Despite Dr. Diana declining Mother's third referral, Mother began another round of counseling with Dr. Rodriguez in February 2019.

**¶12**        Circumstances deteriorated even more when Mother started using methamphetamine again and also began using heroin. Mother stopped taking her prescribed medications at this time because she was concerned about how they might interact with the illegal drugs. DCS learned that Mother and Father Steven had continued living together despite the Order of Protection, but that they had been evicted. Mother became pregnant by Father Steven and was still pregnant at the time of trial. Around this time, Mother also threatened suicide to a police officer.

¶13        At this point, DCS moved to terminate Mother's parental rights on nine-month time in care, abuse, and mental-illness grounds. The juvenile court set the severance trial for June 2019.

¶14        In April 2019, the juvenile court ordered DCS to re-implement therapeutic visits between Mother and the children because the children had started to refuse visits. These visits were unproductive, as Mother struggled to manage the children and often used inappropriate language. During this same time, Mother had multiple instances of domestic violence between her and Father Steven, two of which led to criminal charges against her—one regarding drug possession and the other for aggravated assault.

¶15        Because of these events, DCS filed an emergency motion to temporarily suspend Mother's visits with all children. DCS also amended its motion for termination to include the fifteen-month time in care ground. The juvenile court granted the emergency motion pending an evidentiary hearing, but DCS withdrew the motion at the hearing. As a result, the juvenile court extended the severance trial (previously scheduled for June) to September.

¶16        Therapeutic visits again proved unproductive because J.C. continued to react negatively to them. Moreover, Dr. Rodriguez noted Mother was "regressing" in therapy and expressed the same concerns with her that he had back in October 2018.

¶17        The juvenile court held a five-day severance trial spanning September, October, and November 2019. In a detailed ruling, the court ordered termination of Mother's parental rights finding parental unfitness based on abuse, mental illness, and fifteen-months time in care grounds. Mother timely appealed.

**DISCUSSION**

¶18        We review the termination of parental rights for an abuse of discretion. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 369, ¶ 15 (App. 2018). This court will uphold the juvenile court's findings of fact "if supported by adequate evidence in the record." *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 452, ¶ 19 (App. 2007) (quoting *State v. Smith*, 123 Ariz. 243, 247 (1979)). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).

¶19        "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982). "[S]uch a standard adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process." *Id.* at 769.

## I.        Statutory Ground

¶20        To terminate the parent-child relationship, the juvenile court must find parental unfitness based on at least one statutory ground under A.R.S. § 8-533(B) by clear and convincing evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

¶21        The juvenile court may terminate parental rights under the fifteen-month time in care ground if it finds that: (1) "[t]he child has been in an out-of-home placement for a cumulative total period of fifteen months or longer"; (2) "the parent has been unable to remedy the circumstances" that cause the out-of-home placement; and (3) "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8)(c).

¶22        Here, the record reflects Mother's children had been in out-of-home placement for almost two years at the time of trial. Mother also received a litany of services through both DCS and self-referral, including multiple psychological evaluations; individual counseling; anger management counseling; substance abuse testing and treatment; medication management; therapeutic visitation; a parent aide; a bonding and best interest evaluation; and multiple housing subsidies. The juvenile court found that "[g]iven the amount of time that Mother has had to engage in counseling, remain consistent on medication, and keep stable housing, and given her inability to change her conduct, there is a substantial likelihood that Mother will not be capable of exercising proper and effective care and control in the near future." The court also noted that Mother was "still unable to provide the [c]hildren with a stable home."

¶23        Substantial evidence supports these findings. Dr. Rodriguez testified that, despite forty-two counseling sessions over almost two years (which were on-going at the time of trial), Mother still lacked progress and was unable to meet her goals. Dr. Rodriguez also agreed that Mother's own actions kept her from meeting her goals. Dr. Rodriguez further testified that Mother struggled to meet her own basic needs, like housing, finances, and

transportation, and that these issues would make it difficult to parent. Dr. Diana agreed, testifying that almost two years of extensive services had led to virtually no progress in addressing the issues leading to out-of-home placement.

**¶24** Dr. Rodriguez also testified that Mother was inconsistent in taking her prescription medications to treat her mental health issues. The doctor expressed concern because Mother continued to exhibit behavior resulting in police involvement as late as April 2019. On appeal, Mother highlights the fact that at certain points she stopped her medication out of necessity because she was pregnant. But the record reflects Mother stopped her medication at different times for various reasons—including at one point out of concern for how it would interact with the illegal drugs she was taking. The juvenile court found that Mother had ample time and resources to take her medications consistently and change her conduct, but nevertheless failed to do so. We will not reweigh this evidence. *Jesus M.*, 203 Ariz. at 280, ¶ 4.

**¶25** Lastly, regarding Mother's ability to provide a stable home, she testified that at one point during trial, she was living week-to-week in hotels and other temporary places like her van. But during trial in November, Mother was accepted into the Center for Hope, where she began residing and participating in further services like counseling and drug testing. Mother emphasizes her acceptance into this program on appeal, but again we decline to reweigh the evidence. *Jesus M.*, 203 Ariz. at 280, ¶ 4. The juvenile court found that "Mother's several year involvement with [DCS] ha[d] been a cycle of domestic violence, substance abuse, homelessness, and out-of-control behavior followed by improvement for a time, and then the cycle begins again" and was likely to repeat itself in the future. Substantial evidence supports the court's findings and we find no error.

## II. Best Interests

**¶26** Once a court has found at least one statutory ground to terminate, it may "presume that the interests of the parent and child diverge." *Kent K.*, 210 Ariz. at 286, ¶ 35. We thus focus our inquiry at the best interests stage on "the interests of the child as distinct from those of the parent." *Id.* at 285, ¶ 31. The "child's interest in stability and security" is the touchstone of our inquiry. *See id.* at 286, ¶ 34. Termination of parental rights is in the child's best interests "if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2008). A child benefits from termination when the child is adoptable or a current adoption plan is in

place. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4, ¶ 12 (2016). "The existence and effect of a bonded relationship between a biological parent and a child, although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98–99, ¶ 12 (App. 2016). The juvenile court must consider the totality of the circumstances existing at the time of the severance. *Alma S.*, 245 Ariz. at 150, ¶ 13.

**¶27**         Here, the juvenile court found that the children were all in adoptive placements and that termination would allow them to be adopted. While the court acknowledged that "[A.C.] would be heartbroken if Mother was no longer her in her life" and that J.C. might be conflicted, the detriment of "continuing [a] parental relationship[] that ha[d] resulted in chaos, emotional abuse, and repeated exposure to substance abuse and domestic violence[]" weighed in favor of termination. *See Dominique M.*, 240 Ariz. at 98–99, ¶ 12. The court further found that, as to the Twins, their adoptive placement was the only home they had really known and they would be harmed by a continued relationship with Mother. Substantial record evidence supports these findings, and we find no error.

## CONCLUSION

**¶28**         We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA